UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 93-2707
_____


UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

                    versus

KENNETH P. HENDERSON,

                              Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Texas
_____

(April 13, 1994)


Before GARWOOD and BARKSDALE, Circuit Judges, and WALTER[1], District
Judge.


WALTER, District Judge:

     Kenneth P. Henderson appeals his conviction for fraudulent

banking activities.[2]  Henderson questions the sufficiency of the

_____

     [1]District Judge of the Western District of Louisiana, sitting
by designation.

     [2]Henderson was convicted on five counts.  Counts one and four
charged Henderson with bank fraud in violation of 18 U.S.C. § 1344.
Count two involved a violation of 18 U.S.C. § 656, for misapplying
bank funds.  The third count was brought under 18 U.S.C. § 1005,
for making false entries in the records of a federally insured

evidence and several of the trial judge's evidentiary rulings. Finally, Henderson argues that the trial court erred in applying the sentencing guidelines to count one of the indictment. For the reasons that follow, we affirm in part and reverse in part.

## Background

This case involves a long-term professional relationship and personal friendship gone awry. Kenneth P. Henderson began to handle Dr. Charles Howard's banking business in 1970. Over the years, the two became close personal friends and trusted business associates. Unfortunately, this relationship led ultimately to Mr. Henderson disregarding important federal banking regulations. To understand how Mr. Henderson and Dr. Howard got to this point, we must retrace their relationship from its early days.

Kenneth Henderson met Dr. Howard in 1970, while Henderson was president of Northshore Bank in Houston, Texas. A friendship developed, and when Henderson left Northshore in 1973 to become president of Greater Houston Bank, he took Dr. Howard's account with him. Henderson left Greater Houston in 1979, taking over the

_____

bank. Count five charged a violation of 18 U.S.C. § 1014, for making false statements to a federally insured bank. All five counts also involved 18 U.S.C. § 2, which defines those persons that may be charged as principals.

The indictment alleges that Henderson defrauded, or attempted to defraud, 18 U.S.C. § 1344 (1), and obtained or attempted to obtain money or property owned by and under the care, custody and control of the banks, 18 U.S.C. § 1344 (2). Although neither the indictment nor the judgment cite a specific subsection of section 1344, the government offered evidence that subsections (1) and (2) were violated by Henderson.

2

Vice Presidency of the Board of Directors at First Bank and Trust (FB&T) in Tomball, Texas. Again, Dr. Howard's accounts followed. Henderson soon became the Chairman of the Board of Directors at FB&T.

Dr. Howard held investments in certain hospitals and other real estate in the Houston area. During a visit to one of these hospitals in 1982, Henderson and Howard discussed the prospects for opening a new bank. They believed that northwest Houston had growth potential and would be an excellent location for a bank. Dr. Howard and other businessmen then applied for a federal bank charter in the name of Cy-Fair Bank, N.A. (Cy-Fair). The charter was granted and Cy-Fair opened in a shopping center near Jones Road in northwest Houston.

Henderson and Howard began looking for property in the region to build a permanent bank building for Cy-Fair, complete with drive-through facilities. Sometime in 1982 or 1983, Henderson located a 9.3 acre parcel along Jones Road. Howard agreed that this lot would be a good location for the new Cy-Fair bank. Henderson and Howard then orally agreed to become partners in the acquisition of the Jones Road property. Howard agreed to borrow the money for the purchase in his own name, and Henderson agreed to reimburse Howard for half the loan payments and other costs associated with the Jones Road property.

Henderson and Howard agreed to borrow the money for the Cy-Fair bank property from FB&T, a bank owned by Henderson.[3] In April of 1983, Henderson, acting as loan officer for FB&T, made a $456,818.62 loan to Dr. Howard for three acres of the Jones Road property. This loan was ratified by the FB&T Board at its May, 1983 meeting.[4] Henderson made a second loan to Dr. Howard on April 16, 1984, for $443,000.00, which covered another 1.5 acres along Jones Road. The FB&T Board ratified this loan at its May, 1984 meeting. Dr. Howard received a third loan--again with Henderson acting as loan officer--for the Jones Road real estate on April 11, 1985. The FB&T Board ratified this loan in May, 1985. The 1985 loan covered the remaining Jones Road acreage and consolidated the previous two loans; the 1983 and 1984 loans were paid, including $100,000 in interest, with the 1985 loan. The 1985 loan was for $1,435,000.00 and had a maturity date of April 11, 1987. On April 11, 1986, Henderson extended the Jones Road loan, changing the maturity date to April 11, 1989.

All the loans on the Jones Road property were in Howard's

_____

[3]Henderson claims to have owned only a 23% interest in FB&T. It is undisputed that he was the largest shareholder in FB&T and served as Chairman of the FB&T Board of Directors from 1979 until the bank was taken over by the FDIC in 1988.
Henderson was also one of the seven founding directors of Cy-Fair Bank and served as Chairman of the Cy-Fair Board from its founding in 1983 until December 1986. Cy-Fair failed on April 14, 1988.

[4]It is not clear whether the Board customarily pre-approved loans of this nature or simply ratified loans already extended. The government implies, and certain testimony supports, that Henderson should have received board approval before making the loan to Dr. Howard. Henderson contends that the loans to Dr. Howard were handled in the same manner as all other FB&T loans.

name. However, the financial statements filed by Dr. Howard for the 1984 and 1985 loans indicated that only half the payments were being made from Howard's own assets. Henderson voted to ratify these loans at the FB&T Board meetings, over which he presided. It was clear from the minutes of these meetings that the other directors knew Henderson had personally made these loans to Dr. Howard. Henderson never disclosed that he was Dr. Howard's "silent partner" in the Jones Road property.

In June of 1985, Henderson and Dr. Howard decided to bring in two additional partners to spread the risk associated with the Jones Road venture. Leo Kalantzakis and Dr. Richard Hausner became full partners during the summer of 1985, each assuming responsibility for one-quarter of the costs of the property. Both testified that Henderson and Howard held themselves out as partners in this investment. They also testified that Henderson never acted as though his interest in the Jones Road development differed in any way from that of the other partners. Henderson paid for his share of the loan costs, taxes, and other expenses.

Two factors combined to doom the plans for the new Cy-Fair bank. First, the Houston economy began to slump during late 1985 and remained flat through 1986 and 1987. Second, five new banks were granted charters within a five mile radius of Cy-Fair. These conditions did not favor the Cy-Fair Bank expansion. Therefore, the Jones Road partners--Henderson, Howard, Kalantzakis, and Hausner--decided to put off building the new Cy-Fair Bank building. This decision made it difficult for the partners to make their

5

payments on the FB&T loan.

During 1986, Henderson applied for and received a $147,500 loan from Cy-Fair. He presented two financial statements, dated June 15, 1984, and July 1, 1986, neither of which indicated any interest in the Jones Road property. Nor did Henderson disclose that he was making payments related to the Jones Road property on the cash flow portion of these financial statements.

In late 1987 an FDIC examination began to focus on FB&T's 1985 loan to Dr. Howard. An FDIC report, dated November 21, 1987, classified that loan as "worrisome". When Henderson found out about this investigation, he contacted Dr. Howard and asked for a letter showing that Henderson was never a partner in the Jones Road venture, but held an option to purchase an interest in the property. Howard testified that he agreed to sign such a letter out of compassion for Henderson. Henderson presented this letter at trial bearing a November 5, 1985 date.

The government presented several reasons to doubt the authenticity of the November 5, 1985 letter. First was Dr. Howard's direct testimony that the letter was prepared by Henderson and signed in either late 1987 or early 1988. Next the government pointed out that the November 5, 1985 letter referred to 6.14 acres, although Howard and his partners owned 9.32 acres at that time.[5] Further, the letter referred to a maturity date of April

---

[5]In June 1986, *seven months after the alleged November 5, 1985 letter*, the seller of the Jones Road property foreclosed on 3.14 acres, leaving Howard and his partners with 6.14 acres. On November 5, 1985, the partners still owned the entire 9.32 acre tract, subject of course, to the FB&T loan.

11, 1989, although the Jones Road loan had a maturity date of April 11, 1987 on November 5, 1985. The maturity date was extended to 1989 when the loan was refinanced on April 11, 1986. Finally, Dr. Hausner testified that Dr. Howard told him of Henderson's request for a "sham option" letter sometime during early 1988. Howard told Hausner that he expected Henderson to try to use the letter to avoid liability on the FB&T loan.

Henderson presented two additional letters, allegedly signed by Dr. Howard, to show that he held only an option on the Jones Road property. A letter dated November 4, 1985 indicated that Henderson held an option to purchase one-half of Dr. Howard's interest in the Jones Road lot. The second letter, dated April 16, 1987, stated that Henderson's option had been terminated because of his failure to make the required payments. Both letters were attacked as bogus by the government. Howard denied ever seeing or signing either letter. Neither letter was similar in type style to the November 5, 1985 letter.

An expert on banking regulations testified that Henderson's actions jeopardized the financial integrity of both FB&T and Cy-Fair. According to this expert, Henderson's conduct exposed both banks to regulatory penalties, which can have an indirect, detrimental effect on a bank's business. Further, Henderson exposed the banks to direct risk of loss by making or requesting funds for suspect projects without disclosing all the details of these endeavors.

Board members from FB&T and Cy-Fair testified that both loans

7

probably would have been made even if Henderson had disclosed his interest in the property. These directors also testified that they were aware of the regulations requiring disclosure of such interests, and that an interested director is prohibited from taking part in transactions affecting his interest. The FB&T directors stated that, in their opinion, Henderson should not have acted as loan officer for the Jones Road loans and that he should not have participated in the ratification votes on these loans. It was also shown that Henderson had properly disclosed an interest in bank loans in the past, indicating that he understood the relevant regulations.

## I.  Sufficiency of the Evidence

Henderson raises three specific issues concerning the sufficiency of the evidence presented at his trial. First, Henderson questions whether an interest based on an unenforceable oral contract can support a conviction for bank fraud, misapplication, or false statements. Second, Henderson argues that a bank officer's failure to disclose a personal interest in a loan cannot constitute bank fraud. Finally, Henderson asks whether a loan to a credit-worthy borrower constitutes misapplication of bank

funds because the loan officer has an undisclosed interest in the proceeds of the loan.[6]

A.    The Statute of Frauds

Henderson's statute of frauds argument proceeds in two steps. First, Henderson argues, the statute of frauds makes the oral agreement with Dr. Howard unenforceable.  Henderson then contends that there is no obligation to disclose unenforceable contracts. This argument misconstrues both the statute of frauds and the substantive federal criminal provisions involved in this case.

"[T]o prevent fraud by those who would misrepresent verbal promises, the statute [of frauds] require[s] written proof in certain cases before performance can be enforced in the courts." *Clements v. Withers*, 437 S.W.2d 818, 821 (Tex. 1969) (Reavley, J.). Henderson contends that the statute of frauds would "slam the door shut on" Dr. Howard had the doctor tried to enforce the contract. However, that is not the question.  The question is whether or not Henderson stood to benefit from the loans to Dr. Howard.

The statute of frauds does not shield Henderson from federal

_____

[6]At oral argument, Henderson also argued that his failure to inform FB&T of his interest in the Jones Road property could not constitute bank fraud under 18 U.S.C. § 1344, because his omissions were not material.  Henderson relies on the testimony of two FB&T directors that the loans to Dr. Howard probably would have been made even had Henderson informed the FB&T Board of his interest in the Jones Road land.  However, there was also testimony that the Directors of FB&T realized that Henderson had violated banking regulations by failing to disclose his interest. There was sufficient evidence to support the jury's conclusion that Henderson's omissions were material.

banking regulations. If Henderson hoped to profit on the Jones Road property, he was "interested". It doesn't matter whether Henderson was a full partner or just held an option on the property. Either way, Henderson stood to gain as a result of FB&T's decision to extend credit to Dr. Howard. Henderson breached his fiduciary duty as a member of the FB&T Board by failing to disclose his interest. The only way the statute of frauds would change this analysis is if Dr. Howard had already rejected the agreement when the loans were made. Henderson has made no such claim.

The statute of frauds may not be used to facilitate the execution of a fraud. Henderson's covert agreement with Dr. Howard was oral to prevent its detection. To use the statute of frauds to invalidate this agreement would insulate Henderson's fraudulent activities. The Texas Supreme Court has held that such conduct cannot be protected by invoking the statute of frauds. *Nagle v. Nagle*, 633 S.W.2d 796, 799 (Tex. 1982) (citing *Hooks v. Bridgewater*, 229 S.W. 1114, 1116 (Tex. 1921)).

Henderson argues that an interest in the subject of a bank transaction must be a legally enforceable interest to warrant disclosure. We disagree. It is enough that Henderson intentionally hid his interest in the Jones Road property. *See, e.g.*, *United States v. Kington*, 875 F.2d 1091, 1100-01 (5th Cir. 1989) (failure to disclose that a loan was made to purchase bank stock from the loan officer is fraudulent and supports a conviction under 18 U.S.C. § 656 (misapplication of bank funds)).

10

B.    *Fiduciary Duties and Bank Fraud*

Henderson's second sufficiency argument focuses on the bank fraud count for the 1985 FB&T loan to Dr. Howard.  Henderson contends that "this case involves nothing more than a breach of fiduciary duty," and therefore, does not constitute a "scheme or artifice" to defraud under 18 U.S.C. § 1344.  We disagree.

In the first place, this case involves more than a breach of fiduciary duty.  Henderson's activities violated federal banking regulations and exposed FB&T to civil penalties.  Further, Henderson did more than sit quietly by while the FB&T Board approved a loan in which he was interested.  Henderson had an obligation to avoid participating in any bank transactions that affected him personally.  Henderson was also obliged to inform the Board of Directors of his interest--however he defined it--in the Jones Road real estate.  Finally, Henderson had a duty to abstain from the Board vote on the Jones Road loans.

There was also evidence that Henderson took active steps to keep his agreement with Dr. Howard concealed.  Howard testified that Henderson wanted their agreement oral so that no one could trace the loan back to Henderson.  Henderson accepted Howard's financial statements without question, even though those statements clearly indicated that Howard had a "silent partner" paying half the loan costs.  Finally, there was evidence that Henderson created bogus letters to characterize his interest in the Jones Road

11

property as an option.  There was sufficient evidence to allow a rational juror to conclude, beyond a reasonable doubt, that Henderson's actions constituted a "scheme or artifice" to defraud FB&T.[7]

C.    *Credit Worthiness of Dr. Howard*


Henderson's final sufficiency attack goes to count two: misapplication of bank funds in violation of 18 U.S.C. § 656.  This count is based on Henderson's role in securing the 1985 FB&T loan for Dr. Howard.  Henderson argues that because Dr. Howard was a credit worthy borrower, there can be no violation of section 656.  Again, we disagree.

In *United States v. Saks*, 964 F.2d 1514, 1519 (5th Cir. 1992), this court held that the financial well being of the borrower would not prevent a conviction for bank fraud under 18 U.S.C. § 1344.  In support of this conclusion, the court approvingly cited cases from other circuits, including *United States v. Walker*, 871 F.2d 1298 (6th Cir. 1989).  *Walker* involved a conviction for misapplying bank funds.  The following excerpt is particularly appropriate:

> In this case, evidence of Hastings' and Hollaway's credit worthiness and their understanding of the obligation to repay was irrelevant, as the trial court held.  Mr Walker arranged these loans for his own benefit, concealing his interest in them from other bank officials.  With these facts, the government adequately

---

[7]Because we find sufficient evidence of more than a mere breach of fiduciary duty, we need not reach the question of whether or not such a breach alone can constitute a "scheme or artifice" to defraud.

established Walker's intent to defraud the bank. The fact that the loans were otherwise "good" loans, and that the named borrowers understood their obligation to repay the loans if Walker defaulted on them, is irrelevant because Walker personally benefited from the transactions at issue.

*Walker*, 871 F.2d at 1307. We adopt the reasoning of the Sixth Circuit and hold that the credit worthiness of Dr. Howard was irrelevant to the misapplication of bank funds charge against Henderson.

## II. The Trial Court's Rulings

Henderson questions three rulings of the trial court. First, Henderson argues that the judge erred in excluding expert testimony concerning the statute of frauds or in the alternative that the judge should have instructed the jury on the statute of frauds. In the second ruling questioned by Henderson, the trial judge excluded certain evidence concerning Dr. Howard's wealth. Finally, Henderson complains that a government witness' testimony was improperly bolstered using a prior consistent statement. We reject each of these arguments.

The statute of frauds offers no refuge to Henderson. Because Henderson's obligation to disclose his interest in the Jones Road property does not depend on the applicability of the statute of frauds to his agreement with Dr. Howard, the trial court was correct in excluding expert testimony on this subject. Further, the judge's jury instructions properly defined the elements of the charges against Mr. Henderson. There was no reason to confuse the

13

jury with an unnecessary instruction concerning the statute of frauds.

This court has held that the credit worthiness of a borrower will not insulate a bank officer from charges of bank fraud. *United States v. Saks*, 964 F.2d 1514, 1519 (5th Cir. 1992). The same principle applies to the other charges against Henderson. More importantly, the trial judge did not exclude all evidence of Dr. Howard's wealth. He allowed testimony to the effect that Howard was a wealthy man. Henderson objected when the judge refused to allow specific evidence of Dr. Howard's financial status. We believe the judge acted properly in excluding this evidence.

Henderson complains that the trial court improperly allowed Dr. Hausner to bolster the testimony of Dr. Howard with a prior consistent statement. Under Federal Rule of Evidence 801(d)(1)(B), a prior consistent statement may only be "offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Fed. R. Evid. 801(d)(1)(B).

This objection refers to Dr. Hausner's testimony that Dr. Howard told him about the "sham option agreement" letter during early 1988 (the letter dated November 5, 1985). The government elicited this information to support Dr. Howard's prior testimony that this letter was, in fact, prepared in late 1987 or early 1988, rather than 1985. Henderson argues that Dr. Howard's testimony on this point was not attacked during cross examination, and

14

therefore, the testimony of Dr. Hausner should have been excluded.

A review of the record indicates that Henderson did question Dr. Howard about the letter dated November 5, 1985. In fact, Henderson offered the two other letters--the option letter dated November 4, 1985 and the option termination letter dated April 16, 1987--in connection with this questioning. Howard was also asked about the timing of an alleged FBI investigation of Henderson, implying that Howard was lying about the letter dated November 5, 1987, to help the FBI and to protect himself. Henderson even asked Howard about a civil suit in which the FDIC sued Howard to recover on the Jones Road loans. All of this questioning casts Dr. Howard's testimony regarding the letter dated November 5, 1985 into doubt. It also raises questions about Dr. Howard's motives and possible collusion between Howard and the government. We believe that these questions constitute an "implied charge against [Dr. Howard] of recent fabrication or improper influence or motive." Fed. R. Evid. 801(d)(1)(B). There was no error in admitting the testimony of Dr. Hausner.


III. Sentencing Issues


Four issues are raised by Henderson concerning his sentencing. Henderson first questions the trial judge's decision to impose consecutive sentences on the counts related to the 1985 FB&T loan

to Dr. Howard. The same issue is presented by the sentences imposed on counts four and five, which relate to the financial statements filed in connection with Henderson's 1986 loan from Cy-Fair. Third, Henderson objects to the district court's use of the Sentencing Guidelines for count one. Henderson's final objection--and the only objection with merit in this appeal--concerns the amount of loss to FB&T and Cy-Fair caused by Henderson's activities.

### A. Consecutive Sentencing

The district court sentenced Henderson to five years in prison on counts two, three, and four,[8] with all three sentences to run concurrently. Count one, bank fraud for the 1985 FB&T loan, resulted in a 51 month sentence under the Sentencing Guidelines. This sentence runs consecutively with the five years imposed on counts two, three, and four. Henderson was sentenced to an additional two years on count five for making false statements to Cy-Fair Bank in the financial statements filed with his loan application. Henderson faces a possibility of eleven years and three months in prison (51 months for count one, plus five years

---

[8]Count two charged violation of 18 U.S.C. § 656 for misapplication of bank funds due to the 1985 FB&T loan to Dr. Howard. Count three charged violation of 18 U.S.C. § 1005 for making false entries in bank records, due to Henderson's failure to inform FB&T of his interest in the Jones Road property. Count four charged Henderson with bank fraud, 18 U.S.C. § 1344, for his 1986 loan from Cy-Fair.

for counts two, three, and four, plus two years for count five).[9]

Henderson argues that consecutive sentences based on the same conduct are multiplicious, and therefore, must be vacated. According to Henderson, sentences for the counts related to the 1985 FB&T loan to Dr. Howard must run concurrently. The same would be true for the two counts based on Henderson's 1986 loan from Cy-Fair. Under this logic, the sentences for counts one, two, and three, which must run concurrently with each other, could be consecutive with counts four and five. Henderson misunderstands the law of multiplicious sentencing.

Claims of multiplicious sentencing generally fall into two distinct categories. First, sentences are multiplicious if the same act results in multiple punishments for multiple counts *under the same criminal provision*. Our recent decision in *United States v. Hord*, 6 F.3d 276 (5th Cir. 1993), is illustrative. Hord was convicted on 19 counts, nine of which were brought under the bank fraud provision, 18 U.S.C. § 1344. These nine counts were based on depositing bogus checks, withdrawing the funds, and then having a bank regulator "pull" the checks before they were processed. Hord was charged under a different count for each deposit and withdrawal. We vacated the sentences and the associated monetary assessments for the three counts based on the attempted withdrawals, because they were multiplicious with the counts based on the deposits. We held that it was the deposit that consummated

[9]Henderson is eligible for parole on counts two through five, because those sentences were not imposed under the Sentencing Reform Act of 1984.

17

the "scheme" requirement of section 1344, and that the attempted withdrawals were simply additional steps in the same "schemes". Hord, 6 F.3d at 282. Each "scheme" constituted bank fraud, but to punish twice for a single bank fraud would violate double jeopardy. In cases like Hord, the legal question raised is whether or not the separate counts under the same criminal provision actually constitute separate violations of that law.

Multiplicity may also be a question when a single act provides the basis for convictions under different criminal laws. Again the question raised is whether or not multiple counts are actually the same offense. However, in this context,

> [t]he applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is to determine whether each provision requires proof of a fact which the other does not.

*United States v. Galvan*, 949 F.2d 777, 781-82 (5th Cir. 1991) (citing *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932)).

Henderson's claims fall into the second category. Therefore, we must determine whether or not the proof required for bank fraud differs from that required for either misapplication or making a false entry.[10] It does. In fact, each of these criminal provisions involves an element not found in the others. Bank fraud requires a "scheme or artifice" to defraud. No similar requirement is found in either 18 U.S.C. § 656, misapplication, or 18 U.S.C. § 1005,

---

[10]Counts two and three run concurrently, and therefore, raise no multiplicity concern.

18

making a false entry. Misapplication requires that the bank official "misapply" the funds, that is, that he either make the questioned loan or play a significant role in the decision to make the loan. Neither bank fraud nor making false entries contains this requirement. Finally, making a false entry obviously contemplates entries made in official bank records, an element missing from bank fraud and misapplication. Henderson's multiplicity argument fails as to the three counts based on the 1985 FB&T loan to Dr. Howard.

Henderson fares no better on the counts related to the 1986 Cy-Fair loan. These counts were based on bank fraud, 18 U.S.C. § 1344, and making a false statement to an insured bank, 18 U.S.C. § 1014. Again, the two crimes are different. There is no "scheme or artifice" requirement in section 1014. Further, there is no requirement that the person charged with bank fraud make a materially false statement to an insured bank.

There is a constitutional reason for this result. When Congress enacts a criminal law, pursuant to an enumerated power, Congress determines the appropriate punishment or range of punishments for that crime. If Congress defines multiple crimes that may be implicated by the same conduct, there is a strong presumption that Congress intended that each criminal provision apply. Only by enforcing every law violated by certain conduct can the prosecutor effectively vindicate the interests served by each distinct criminal enactment. Similarly, it is presumed that Congress intends that every crime carry its own punishment.

19

Therefore, as long as the crimes can be properly characterized as different "offences" for double jeopardy purposes, a defendant convicted of multiple crimes may receive cumulative punishment. Henderson could have received consecutive sentences on every count of this indictment.

   B.   *Applicability of the Sentencing Guidelines to Count One*

   Henderson contends that the bank fraud alleged in count one was complete before November 1, 1987, the effective date of the Sentencing Guidelines. The district court made a factual finding that count one continued past November 1, 1987, and therefore, applied the Guidelines. We review this finding for clear error.

   The trial court heard the testimony concerning the letter dated November 5, 1985. Substantial evidence was offered to show that this letter was actually prepared in late 1987 or early 1988. Dr. Howard also testified that this letter was either prepared by Henderson or prepared at his request. Further, evidence from the grand jury investigation of Henderson, which was presented at the sentencing hearing, indicated that this letter was prepared a few months before the failure of FB&T. This evidence led the district judge to find

> that the engagement between the defendant and Dr. Howard occurred in and after November of 1987 based upon what I heard at trial and based upon what you presented here in court; and if you find something in there different than that, then, read it to me. I would like to hear it.
> But what I heard so far is that it was about the time the bank failed, which was in March of `88, or a few months prior to that. A few to me means three or less;

20

and of course, that would put it back in November, December of 1987.

Given this evidence of Henderson's continuing efforts to deceive both FB&T and federal regulators into late 1987 or early 1988, we do not find the district court's conclusion clearly erroneous.

### C. The Amount of Loss Calculation

Henderson requested a hearing on the amount of loss. He hoped to show that the amount calculated in the pre-sentencing report (PSR) was incorrect. The district court denied this request, and instead considered Henderson's written objections to the PSR and the evidence proffered at sentencing. The district court then adopted the calculations made in the PSR, but modified the amount of loss to include interest on the two fraudulent loans. Henderson renews his objections on appeal. "In examining a challenge to a sentence based on the Guidelines, we must accept the factual findings of the district court unless they are clearly erroneous, but we fully review its application of the Guidelines for errors of law." United States v. Rodriquez, 925 F.2d 107, 109-10 (5th Cir. 1991). We review the district court's denial of Henderson's hearing request for an abuse of discretion.

We first consider the district court's denial of Henderson's hearing request. At the outset we note that a sentencing hearing was conducted, and that the amount of loss issue was discussed at that hearing. Henderson's objection, therefore, goes to the form of the hearing, and more specifically, to the district judge's

refusal to allow testimony at the sentencing hearing.  Essentially, Henderson requested a mini-trial, complete with exhibits, expert witnesses, character witnesses, and an opportunity to cross examine the government's witnesses.  Refusing to conduct such a hearing does not constitute an abuse of discretion in this case.

Henderson had an opportunity to review the PSR and file formal objections to that report.  He could have filed affidavits and other exhibits in support of his position.  At the sentencing hearing, Henderson presented several exhibits and objected to some of the exhibits proffered by the government.  Henderson's due process rights were protected adequately by these procedures.

We recognize the due process concerns behind this issue.  However, we believe that a sentencing court must be given deference to determine whether a hearing is needed on particular sentencing issues.  When a hearing is necessary to protect a convicted defendant's due process rights, then a failure to hold a hearing would be an abuse of discretion.  We do not believe Henderson's due process rights were violated.  Henderson could have presented the sentencing judge with all the information necessary to calculate the amount of loss without cross examining the government's sources.

The district court calculated a $2,344,646.38 loss due to Henderson's actions, which included the face value of both the 1985 FB&T loan and the 1986 Cy-Fair loan, plus interest on both loans. Henderson argues that the district court should have reduced this amount to account for value recovered, or likely to be recovered,

22

by the banks or the FDIC on these loans.  Henderson further objects to the inclusion of interest in the amount of loss.

We must first determine what procedure the district court used to determine the amount of loss.   If the district court's calculation was an estimate of the actual loss caused by the two loans in question,

> the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (*or can expect to recover*) from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used.

United States Sentencing Commission, *Guidelines Manual*, § 2F1.1, comment. (n.7) (emphasis added).

The district court based Henderson's sentence on an intended loss.[11]   This decision was based on the district judge's understanding of the meaning of "intended loss" under the Sentencing Guidelines.  The following excerpts from Henderson's sentencing are illustrative:

> The question is did I remove something that I shouldn't have removed, did I do something that I

---

[11]If the district court's calculation was an estimate of the actual loss caused by Henderson, that calculation was erroneously performed.  The district court refused to consider whether or not the banks or the FDIC were likely to recover on the defaulted loans.
> It's not a question of whether or not--in my opinion it's not a question of whether or not the bank has ever collected its money or whether it's ever written off the loss or not.  It's an exposure the bank had.  . . .  I think that's what the guidelines and the statute deals [sic] with, not whether or not somebody can collect the money or not.
No effort was made to reduce the amount of loss "by the amount the lending institution has recovered (or can expect to recover)." U.S.S.G. § 2F1.1 comment. (n.7).

23

> shouldn't have done, are the circumstances surrounding the loss such that any reasonable person would conclude that there is fraud and deceit and cheating going on. Are those the circumstances? If they are--and that's what the jury found. If they are, then, it was a loss that was intended because we intend the result of the acts that we take.
>      That's what the law is. We intend the result of the acts we take except in some circumstances.

We find this interpretation erroneous.

The Sentencing Guidelines refer to actual intent, not constructive intent. "[I]f an intended loss that the *defendant was attempting to inflict* can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1, comment. (n.7). If Henderson intended to repay the banks on his loans, the district court should not have used intended loss as the basis for sentencing.

In United States v. Wimbish, 980 F.2d 312 (5th Cir. 1992), we held that the face value of stolen and forged checks was properly used as an intended loss because the victims were put at risk for the full face value of their checks. See also, United States v. Brown, 7 F.3d 1155, 1159 (5th Cir. 1993) (holding that full value of stolen money orders constitute intended loss because, "the defendant *clearly intended Lomoriello to suffer a loss exceeding $5,000*.") (emphasis added); United States v. Sowels, 998 F.2d 249, 251 (5th Cir. 1993) (holding that stolen credit cards indicate an intent to cause a loss equal to the credit limits of the cards). These cases show that the intended loss for stolen or fraudulently obtained property is the face value of that property.

Unlike the cases cited *supra*, where the defendant intends to

24

repay the loan or replace the property, the intended loss is zero. The face value of the property bears no relation to the "loss the defendant was attempting to inflict." U.S.S.G. § 2F1.1, comment. (n.7). Because the district court misinterpreted the meaning of "intended loss" under the Sentencing Guidelines, we must vacate the sentence on count one. The district court must determine if Henderson actually intended to cause a loss to either bank, and if so, the amount of the "intended loss". Only if this value is greater than the actual loss to the banks should it be used to determine Henderson's sentence.[12]

Some comment is necessary concerning the district court's inclusion of interest in the amount of loss. The current commentary to the Sentencing Guidelines[13] provides that the amount of loss "does not, for example, include interest the victim could have earned on the funds had the offense not occurred." U.S.S.G. § 2F1.1, comment. (n.7). We find that this commentary sweeps too broadly and, if applied in this case would be inconsistent with the purpose of § 2F1.1. Stinson v. United States, 113 S. Ct. 1913, 1919 (1993).

Interest should be included if, as here, the victim had a

---

[12]"Where the loss determined above significantly understates . . . the seriousness of the defendant's conduct, an upward . . . departure may be warranted." U.S.S.G. § 2F1.1 comment. (n.7). If both the actual loss and intended loss in this case approach zero, the district court may choose to exercise its discretion and depart upward from the sentence range calculated under the Guidelines.

[13]This commentary was added in 1991, after the date of Henderson's offense. It was incorporated to clarify the Guidelines, and therefore, is indicative of the original purpose of those provisions.

reasonable expectation of receiving interest from the transaction. *See, e.g.*, *United States v. Lowder*, 5 F.3d 467, 471 (10th Cir. 1993) (holding that interest should be included in the amount of loss where the defendant promised victims a specific interest rate on their investments); *United States v. Jones*, 933 F.2d 353, 354-55 (6th Cir. 1991) (interest should be included where the defendant defrauded credit card companies which had a reasonable expectation of a specific return on the credit extended). In the words of the district judge, "interest is a loss, a loss of earnings on money-- representing a loss of earnings on money that was--that rightfully belonged to the bank and therefore should be also included." 11 R. 42-43. We find no error in the district court's decision to include interest in the amount of loss in this case.

Henderson's sentence under count one was calculated in accordance with the Sentencing Guidelines, and therefore, is based, in part, on the amount of loss. The other four sentences were not based on the Guidelines, but may include consideration of the loss attributable to Mr. Henderson. We therefore VACATE Henderson's sentences and REMAND for resentencing. Because we find the method used to calculate the amount of loss flawed, we do not reach the question of whether or not the result of that calculation was clearly erroneous.