

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-30-1999

# U.S. v. Sharma

Precedential or Non-Precedential:

Docket 98-7408, 98-7454, 98-7409, 98-7410

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"U.S. v. Sharma" (1999). *1999 Decisions.* Paper 241.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/241

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 30, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 98-7408, 98-7409, 98-7410, and 98-7454

UNITED STATES OF AMERICA

v.

CHANDRA D. SHARMA,

　　　Appellant

(D.C. Criminal No. 96-cr-00321-1)

UNITED STATES OF AMERICA

v.

SUBODH C. SHARMA,

　　　Appellant

(D.C. Criminal No. 96-cr-00321-2)

UNITED STATES OF AMERICA

v.

SUSHIL C. SHARMA,

　　　Appellant

(D.C. Criminal No. 96-cr-00321-03)

UNITED STATES OF AMERICA

v.

VINOD C. VASISTH,

　　　Appellant

(D.C. Criminal No. 96-cr-00321-04)

Appeal from the United States District Court
For the Middle District of Pennsylvania
D.C. Nos.: 1:CR-96-321-001, 1:CR-96-321-002,
1:CR-96-321-003 & 1:CR-96-321-004
District Judge: Honorable Sylvia H. Rambo

Argued July 12, 1999

Before: GREENBERG, ALITO, and ROSENN,
Circuit Judges.

(Filed August 30, 1999)

      Theodore B. Smith, III (Argued)
      Sally A. Lied
      Office of United States Attorney
      Federal Building
      P.O. Box 11754
      228 Walnut Street
      Harrisburg, PA 17108

      Counsel for Appellee

      Jerry A. Philpott
      227 High Street
      P.O. Box 116
      Duncannon, PA 17020

      Counsel for Appellant
      Chandra D. Sharma

      Michael M. Mustokoff (Argued)
      Teresa N. Cavenagh
      Duane, Morris & Heckscher
      4200 One Liberty Place
      Philadelphia, PA 19103-7396

      Counsel for Appellant
      Subodh C. Sharma

Daniel I. Siegel (Argued)
Thomas A. Thornton
Office of Federal Public Defender
100 Chestnut Street, Suite 306
Harrisburg, PA 17101

 Counsel for Appellant
 Sushil C. Sharma

Michael M. Mustokoff (Argued)
Teresa N. Cavenagh
Duane, Morris & Heckscher
4200 One Liberty Place
Philadelphia, PA 19103-7396

 Counsel for Appellant
 Vinod C. Vasisth

OPINION OF THE COURT

ROSENN, Circuit Judge.

In this appeal from a criminal conviction of, inter alia, conspiracy and bank fraud, the major issue is whether under the Sentencing Guidelines interest owed on a defaulted loan obtained by fraud may be included by the court in calculating the amount of the victim's loss. A jury found that the defendants, a father and his three adult sons, had given material and false statements that misrepresented their financial resources to two banks in order to obtain loans and lines of credit. They defaulted on loans from the State Bank of India ("SBI") valued at $1,890,702.74, of which $670,718.85 was principal and $1,219,983.89 was interest. The district court included both the principal and the interest in its calculation of the amount of SBI's loss, an integral figure in the determination of the defendants' sentences. Raising an issue of first impression in this circuit, the defendants contend that under the interest amendment in 1992 to the Sentencing Guidelines Application Notes, interest on the defaulted loan should not have been included in calculating the victim's loss. The district court disagreed and also rejected the defendants' other claims. We affirm.

3

I.

To obtain loans and lines of credit, defendant Chandra D.
Sharma ("Chandra") and his sons, defendants Subodh C.
Sharma ("Subodh"), Sushil C. Sharma ("Sushil"), and Vinod
C. Vasisth ("Vinod"), made false representations to
Commerce Bank in Harrisburg, Pennsylvania and SBI in
New York City. They grossly misrepresented the value and
profitability of their assets through the submission of false
financial statements. They gave the banks a false picture of
their ability to contribute a substantial sum of their own
money to finance the projects for which they sought loans,
and of the profitability of their businesses, which could
purportedly and adequately collateralize the loans.

In 1985, the defendants began planning to build a sixty-
bed nursing home in the Harrisburg area to be known as
the Victory Garden Nursing Home ("Victory Garden").
Subodh signed a Certificate of Need application prepared by
an accountant. After two conferences with the Health
Resources Planning and Development, Inc., both of which
were attended by Sushil and Subodh, and the latter by
Chandra, the Pennsylvania Department of Health granted
the Certificate of Need.

In December 1985, Subodh, Sushil, and Vinod met with
the architect, Kamal Chaudhury. As a result of that
meeting, Subodh and Chaudhury negotiated two contracts.
In the first contract, Victory Garden promised to pay
Building Technologies, Chaudhury's firm, $5,500 for
preliminary work and $56,000 for architecture and
construction. At Subodh's insistence, Chaudhury signed a
side agreement in which Building Technologies agreed to
have Eaglemark, the defendants' company, provide on-site
construction managers for a fee of $19,500. When applying
for a construction loan with SBI, the defendants submitted
the primary contract but omitted the Eaglemark side
agreement from the supporting documentation to the bank.

In December 1985, Subodh signed an agreement to
purchase fifty acres of land in Duncannon, Pennsylvania
for $75,000. The land was to be used as the nursing home
site. In July 1986, Commerce Bank loaned the defendants
$60,000 for the purchase of the land. Chandra took title to

4

the land solely in his name, but the mortgage on the property was in Subodh and Vinod's name.

In June 1986, Chandra, Subodh, and Vinod agreed to purchase the Sloan Manufacturing and Engineering Company ("Sloan" or "Sloan Manufacturing") for $189,766. Vinod and Subodh signed a promissory note for the purchase price. The principals of Sloan agreed to accept the promissory note for the purchase on the basis of the obligor's financial statement. However, it contained a forged signature of Sushil's accountants. Subodh and Vinod collateralized the note with Eaglemark's assets and guaranty; they subsequently defaulted on their note.

Several months later, the four defendants agreed to purchase D.B. Industries ("Industries") from Dojcin Bulatovic for $175,000. The defendants paid $7,500 down and agreed to pay the remaining $167,500 over fifteen years with interest at ten percent, evidenced by a promissory note confessing judgment and signed by Subodh. Seeking a commercial loan for Industries, Subodh approached Commerce Bank and submitted a falsified sales agreement between Industries and Eaglemark. Most significantly, the falsified agreement stated that the purchase price was $264,000, rather than $175,000. In addition, the agreement stated that the defendants had, with the exception of a $50,000 promissory note given to Bulatovic, purchased Industries with cash. Commerce Bank made the $100,000 loan on the conditions that Industries pay off the purported $50,000 promissory note to Bulatovic, Subodh pay off a second loan on his residence, and Subodh's residence be used as collateral. After Industries defaulted on the loan in July 1991, Sushil, seeking to modify the loan agreement, presented a statement reporting his personal net worth at $1,677,089 and a purported copy of his 1990 tax return that overstated his adjusted gross income.

In January 1987, Subodh, on behalf of all the defendants, sought a $15,000 line of credit from Commerce Bank for Perfect Care, another business owned by the defendants. In connection with the credit application, each of the defendants submitted false personal financial statements that failed to list recently-incurred liabilities. In

5

addition, the defendants inflated the profitability and assets of their companies, V-Care and Perfect Care. In April 1987, Commerce Bank extended the $15,000 line of credit for Perfect Care to use as short-term working capital. However, the defendants used the money for other purposes.

In June 1987, the defendants obtained a loan from SBI for sixty-five percent of the construction costs with a maximum of $1,200,000 to finance the building of Victory Garden. When applying for the loan, the defendants submitted several false documents. Sushil submitted two financial statements for V-Care that were signed but not prepared by a certified public accountant. These statements magnified the company's financial assets. Personal financial statements submitted by each defendant failed to list recently-incurred liabilities. The construction agreement between Victory Garden and G.B. Construction was "doctored" to reflect a contract price of $1,600,000, rather than the agreed-to $1,200,000. A letter from Sushil provided a false explanation for a $2,000 discrepancy between the original sales price and the sales price recited in the deed submitted to the bank for the land on which the defendants planned to build and mortgage the nursing home.

Sushil furnished a summary of project costs that overstated by at least $340,000 the amount of money the defendants had expended on the construction. The summary falsely represented that a New York certified public accountant had traced disbursements of $589,299 to original construction records exclusive of owners' salaries and administrative expenses. Based on the summary, SBI loaned the defendants $383,044 (65% of $589,299), which they transferred to their individual accounts on the day following their execution of the construction loan agreement with SBI. The defendants then drew checks against their respective bank accounts to create the illusion that they were personally contributing 35% to the project as required by their agreement with the bank. Sushil also submitted to the bank a letter from Chaudhury that overstated the progress with the construction of the nursing home.

As collateral, the defendants gave SBI a deed for fifteen acres of the fifty-acre tract on which the nursing home was

6

to be built. The defendants represented that this land was worth $75,000, the purchase price of the entirefifty-acre tract. The remaining thirty-five acres were transferred to Chandra, who conveyed the property to his wife Heena Sharma. Upon discovering these facts, the bank sued in a state court, which found the conveyance fraudulent, and voided it. SBI ultimately obtained the title to thirty-five-acre parcel.

During the construction of Victory Garden, the defendants sought additional money from SBI. Again, they overstated the extent of their investment in the nursing home construction. In February 1988, Vinod filed a Corporate Guaranty of Payment of the construction loan by V-Care, Inc. Subodh did the same one year later. However, V-Care was nonexistent; it ceased to operate in August 1987.

In June 1988, SBI extended a line of credit of up to $258,000 to Sloan Manufacturing. Sloan and a second mortgage on the nursing home secured the credit line. In April 1989, SBI increased the nursing home construction loan from $1,200,000 to $1,850,000. The defendants defaulted on the construction loan and line of credit. Including the interest due and unpaid at the time of the defaults, SBI lost $1,890,702.

Vinod prepared a cost report for Victory Garden to the Pennsylvania Department of Public Welfare ("DPW") for Medicaid cost reimbursement. The report falsely stated that Victory Garden had paid Sushil $79,700 in interest. That claim inflated the nursing home's Medicaid reimbursement. In fact, Victory Garden had not made any interest payments to Sushil, and Sushil claimed none on his income tax returns. As a result of this false statement, the DPW overpaid Victory Garden $63,734.

A grand jury in the United States District Court for the Middle District of Pennsylvania indicted the defendants in December 1996. The indictment charged each defendant with conspiracy to: commit bank fraud, make false statements, submit a false tax return, engage in money laundering, and commit wire fraud (count one). The indictment also charged each defendant with bank fraud

7

(counts two and four), making false statements in connection with loan applications (counts three andfive), and wire fraud (count six). Furthermore, the indictment charged Sushil and Vinod with making a false statement to a federally-funded state health care program (count seven).

The district court denied the defendants' motion to sever count seven from the other counts charged in the indictment.1 After a three-week trial in September 1997, the trial court granted Chandra's motion for judgment of acquittal on count six. The jury convicted all defendants of counts one through five, Sushil of count six, and Sushil and Vinod of count seven. The jury acquitted Subodh and Vinod of count six.

The district court sentenced both Chandra and Subodh to thirty-three-month aggregate prison terms and Sushil and Vinod to aggregate prison terms of thirty-six months. The court ordered each defendant to pay $63,734 in restitution. All of the defendants timely appealed to this court.

II.

A.

The principal issue before us is whether the district court properly included the loan interest that the defendants failed to pay SBI as part of SBI's actual loss. The resolution of this issue affects the length of the defendants' sentences. If interest were excluded from the calculation of loss, the defendants' total offense level would be eighteen rather than twenty, the total offense level the district court computed for each defendant. See U.S.S.G. S 2F1.1. The defendants contend that the district court erroneously included the unpaid interest on SBI's loans in the court's calculation of the amount of SBI's loss. The defendants emphasize that Application Note 8 to U.S.S.G. S 2F1.1 excludes interest from the calculation of loss and assert

_____

1. The district court had subject-matter jurisdiction of this action pursuant to 18 U.S.C. S 3231. We have appellate jurisdiction pursuant to 18 U.S.C. S 3742(a)(2) and 28 U.S.C. S 1291.

8

that the trial court erred in including interest in the calculation of loss and disregarded the plain language of Application Note 8.2

The district court determined that the exclusion of interest in the calculation of loss is only appropriate when the interest represents the victim's opportunity cost.3 The court concluded that when interest is contractually due on a loan, the interest should be included as part of the victim's loss. This court has plenary review over the district court's interpretation of "loss" in U.S.S.G.S 2F1.1. See United States v. Maurello, 76 F.3d 1304, 1308 (3d Cir. 1996).

For losses of at least $1,500,000 and under $2,500,000, the Sentencing Guidelines mandate a twelve-point increase in the base offense level. U.S.S.G. S 2F1.1. The pertinent portion of Application Note 8 provides that "loss is the value of the money, property, or services unlawfully taken; it does not, for example, include interest the victim could have earned on such funds had the offense not occurred." U.S.S.G. S 2F1.1, Application Note 8. Note 8(b) explicates:

> In fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan.

U.S.S.G. S 2F1.1, Application Note 8(b). Because it does not violate the constitution or a federal statute and is not inconsistent with the sentencing guideline, Application Note

_____

2. Application Note 8 was formerly enumerated Application Note 7. Throughout this opinion, we refer to the application note by its current designation.

3. We define opportunity cost as interest that a bank could have earned had it not made the loan in question. See City of Los Angeles v. Department of Transp., 165 F.3d 972, 974 n.1 (D.C. Cir. 1999).

8 is authoritative. See Stinson v. United States , 508 U.S. 36, 38 (1993); United States v. Knobloch, 131 F.3d 366, 372 (3d Cir. 1997) ("Courts are required to follow the Application Notes to the Federal Sentencing Guidelines in imposing sentences for federal offenses.").

This court construed the meaning of "loss" in U.S.S.G. S 2F1.1 in United States v. Kopp, 951 F.2d 521 (3d Cir. 1991). We stated that "the fraud guideline defines `loss' primarily as the amount of money the victim has actually ended up losing at the time of sentencing." Id. at 531. Explaining that Application Note 8(b) "plainly states that where, as here, the defendant fraudulently misstates his assets, the `loss' is the victim's actual loss--unpaid principal and interest less the amount the lender has recovered (or can expect to recover) from the loan collateral," we also concluded that interest on a loan procured after the submission of a fraudulent application should be included in the calculation of loss. Id. at 535.4

However, the Sentencing Commission subsequently amended Application Note 8 to state that the loss "does not . . . include interest the victim could have earned on such funds had the offense not occurred." See United States Sentencing Commission Guidelines Manual, App. C, Vol. 1 (1997) at 279. The Sentencing Commission explained: "This amendment clarifies that interest is not included in the determination of loss." Id. This circuit has not reviewed the viability and perimeters of Kopp in light of the amendment to the application note, which became effective on November 1, 1992.

Several circuits that have held, despite the amendment to Application Note 8, that bargained-for interest due on a loan should be included in the calculation of loss. See United States v. Nolan, 136 F.3d 265, 273 (2d Cir.), cert. denied, 118 S. Ct. 2307 (1998); United States v. Gilberg, 75

_____

4. In their reply brief, the defendants contend that the Kopp court misread or misquoted Application Note 8(b). Our review of the Kopp opinion confirms that this court accurately quoted the application note. Allegations that this court misread Application Note 8(b) amount to nothing more than a disagreement with our interpretation of the application note.

10

F.3d 15, 19 (1st Cir. 1996); United States v. Allender, 62 F.3d 909, 917 (7th Cir. 1995); United States v. Henderson, 19 F.3d 917, 928-29 (5th Cir. 1994); United States v. Lowder, 5 F.3d 467, 471 (10th Cir. 1993); cf. United States v. Allen, 88 F.3d 765, 771 (9th Cir. 1996) (implying interest can be included in calculation of loss). But see United States v. Hoyle, 33 F.3d 415, 419 (4th Cir. 1994) (holding interest not includable in loss calculation and considering interest to be excludable time-value of lenders' money lost).

Application Note 8, as amended, which states that the valuation of loss does not "include the interest the victim could have earned," concerns fraud cases, in which interest typically reflects only opportunity cost. The plain language of the application note suggests that the Sentencing Commission intended to distinguish bargained-for interest from opportunity-cost interest. The application note excludes from the calculation of loss "interest the victim could have earned." U.S.S.G. S 2F1.1, Application Note 8 (emphasis added). Opportunity-cost interest is interest the victim could have earned. In contrast, bargained-for interest is an integral part of the borrower's obligation to the lender. Such interest is an important, enforceable aspect of the contractual agreement and reasonably included in the calculation of the bank's loan. If the Sentencing Commission had intended to exclude bargained-for interest from the loss calculation, it could have used appropriate language when drafting the note. Allender, 62 F.3d at 917.

There is a definitive distinction between interest a debtor is contractually required to pay the victim (i.e., bargained-for interest) and interest a victim could have earned had it invested the money that had been lost as a result of the defendant's misconduct (i.e., opportunity-cost interest). See id. (holding interest on loan is not opportunity cost and includable in calculation of loss); United States v. Goodchild, 25 F.3d 55, 65-66 (1st Cir. 1994) (same); Lowder, 5 F.3d at 467 (same). The former is a specifically defined obligation; the latter is speculative. See Allender, 62 F.3d at 917. A creditor has a reasonable expectation to receive the interest on the loan. See Henderson, 19 F.3d at 928. After the loan agreement is signed, both the principal

11

and the obligatory interest become the creditor's property. See Allender, 62 F.3d at 917. Interest–bearing loans, especially mortgage and equipment loans, are an important part of a large secondary loan market in this country. We read Application Note 8 as requiring the exclusion of opportunity–cost interest, but not bargained–for interest, from the valuation of the victim's actual loss.

In addition to arguing that Application Note 8's interest provision requires the exclusion of the interest owed on the loans to SBI, the defendants assert that Application Note 8(b)'s definition of loss similarly mandates the exclusion of interest owed. This subsection note measures the loss as "the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan." U.S.S.G.S 2F1.1, Application Note 8(b). The defendants maintain that the phrase "amount of the loan" clearly refers to the loan's principal, but not interest. We disagree. At most,"amount of the loan" is ambiguous with respect to whether interest should be included in the calculation of the victim's loss. The debt incurred by a loan, of course, consists of both principal and interest. Although the amount of a loan can refer to only the amount of the principal, in banking and commercial practice the "amount of the loan" is usually construed to include interest due on the loan as well.5 Accordingly, we hold that in determining the amount of the actual loss sustained by the victim in a criminally fraudulent loan the sentencing court may include the contractually bargained–for interest. Thus, the district court did not err when it perceptively included the unpaid interest owed in its calculation of SBI's actual loss.

_____

5. The defendants also claim that Application Note's employment of the verb "repaid" further proves that the Sentencing Commission intended to include only the loan principal in the calculation of the victim's actual loss. This argument is unconvincing. When one repays a loan, one must pay both principal and interest.

12

B.

The defendants claim that the district court erred by not giving them credit for, and thereby not reducing the calculation loss by, the value of assets pledged to SBI that SBI recovered or can be expected to recover. They contend that they should have received a credit for (1) $455,540.76 in Victory Garden's accounts receivable due from the DPW, in which SBI had a security interest; (2) the assets of Industries, which guaranteed the loan to SBI, valued at $119,879.00; and (3) twenty-five percent of the value of properties in Jaipur, India, in which Chandra, who personally guaranteed the loan, had a twenty-five percent interest. Further, the defendants claim that the district court erroneously gave them a $40,000 credit rather than an $80,000 credit for a thirty-five-acre tract of land adjacent to Victory Garden that SBI's appraiser valued at $80,000.

The district court declined to deduct the $455,540.76 Victory Garden claimed that DPW owed because the court found the alleged debt to be insufficiently documented. The court refused to accept the defendants' submittedfigure due to their history of falsifying documents. The court refused to credit the defendants $119,879.00 for the value of Industries and $138,827 for the value of Chandra's purported property interest in homes in India because it found the evidence of the defendants' ownership of the assets to be unclear. The court only credited $40,000 for the thirty-five-acre parcel of land because the defendants never pledged it as security for the loan. We have plenary review over the district court's refusal to give the defendants the claimed credits, see Maurello, 76 F.3d at 1308, but we review the court's factual findings for clear error, see, e.g., United States v. Holman, 168 F.3d 655, 660 (3d Cir. 1999).

Our review of the record reveals that Chief Judge Rambo, the trial judge, committed no error in denying, after careful consideration, all three of the credits that the defendants sought. Her decision to deny the credit for money the DPW purportedly owed Victory Garden is essentially a credibility determination to which the court is entitled deference. This court should not disturb the district court's factual finding

13

on appeal except for clear error. Moreover, the DPW's preliminary audit showed that Victory Garden owed the DPW $311,786.07, rather than the DPW owing Victory Garden money. At a minimum, this cast tremendous doubt on the defendants' claims that the DPW owed Victory Garden $455,540.76, a claim that the DPW strenuously denies it owes at all. Furthermore, the collection of this debt by Victory Garden is also clouded by the sale of the assets in a bankruptcy proceeding in New York. Likewise, the judge's decision not to credit the defendants for the value of Industries' assets is supported by the evidence. There were questions whether the defendants paid Bulatovic, who previously owned Industries, in full. Lastly, because extended members of the defendants' family were challenging Chandra's alleged ownership of the properties in Jaipur, India, the court's conclusion not to credit the value of the Jaipur properties in the calculation of loss had evidentiary and prudential support.

The defendants, however, were entitled to a credit for the value of the thirty-five-acre parcel of land located adjacent to Victory Garden. SBI's appraiser valued the land at $80,000. However, SBI only credited the defendants $40,000 toward the loan's principal, and the court likewise credited the defendants for $40,000. The district court's decision to credit $40,000 rather than $80,000 is not supported by the evidence. SBI's own appraiser valued the thirty-five acre parcel at $80,000. Because SBI ultimately obtained the parcel of land by suit after the defendants' default and gave the defendants a partial credit for its value, the defendants are entitled to a credit for the full value of the land less SBI's expenses in the litigation to acquire title. Thus, the court's decision to credit only $40,000 is erroneous. Nevertheless, the additional credit to which the defendants are entitled for this land would not affect any defendant's total offense level under the Sentencing Guidelines. Thus, the error is harmless.

C.

The defendants argue that Sushil's wire fraud conviction should be reversed because the trial court failed to instruct the jury that materiality is an element of the offense. Since

the trial of this case, the Supreme Court recently held that materiality of falsehood is an element of wire fraud. Neder v. United States, ___ U.S. ___, ___, 119 S. Ct. 1827, 1841 (1999). The Court also held that the failure to instruct the jury that materiality is an element of wire fraud is subject to harmless error review. Id. at 1833-34. Because Sushil's trial counsel requested an instruction that materiality is an element of wire fraud, he preserved the issue for appeal. Accordingly, although the district court did not have the benefit of the Neder decision at the time of the trial, we must determine whether the omission of a materiality instruction was harmless error.

At trial, the Government alleged that Sushil committed wire fraud when in 1991 he sought modifications in the terms of a loan on which the defendants were in default. Sushil faxed Commerce Bank a copy of an income tax form that he purported to have submitted to the IRS. In the tax form submitted to the IRS, Sushil reported an adjusted gross income of $20,408. The purported copy faxed to Commerce Bank recorded an adjusted gross income of $102,754. At closing argument, defense counsel claimed that the difference in the income tax forms did not affect the bank's decision to restructure the loan because (1) the two forms stated the same income, (2) the form sent to Commerce Bank was accurate, and (3) the difference between the two forms, deductions for business losses that were taken on the form sent to the IRS but not on the form faxed to Commerce Bank, reflected a difference of opinion about which reasonable accountants could differ.

We conclude that the difference in the forms was material beyond a reasonable doubt because the adjusted gross income reported in the two forms differed overwhelmingly. The adjusted gross income reported to Commerce Bank was five times larger than the adjusted gross income reported to the IRS. No reasonable fact finder could conclude that this five-fold difference was immaterial. Sushil realized the magnitude of the difference; were it not so, he presumably would not have submitted to the Bank the form showing the substantially greater income. Therefore, we hold that the absence of a materiality charge on the wire fraud count, of which only Sushil was convicted, was harmless error.

15

D.

The defendants assert that the district court erred by not severing the Medicaid fraud count (count seven) from the remainder of the indictment. They claim there is no commonality between the Medicaid fraud charge and the other charges.

We review the district court's denial of the severance motion for an abuse of discretion. United States v. Gorecki, 813 F.2d 40, 42 (3d Cir. 1987). Count one of the indictment charged Sushil and Vinod with conspiracy to commit bank fraud and wire fraud and to make false statements in connection with loan applications and Medicaid reimbursement. "As long as the government has charged conspiracy in good faith, an allegation of conspiracy is a sufficient reason for trying the conspiracy and all substantive offenses together." United States v. Smith, 789 F.2d 196, 206 (3d Cir. 1986). The defendants do not allege that the Government charged conspiracy in bad faith. Critically important, moreover, is that no defendant moved before or at trial to sever the conspiracy count into two counts for being multiplicitous. For these reasons, the denial of the motion to sever count seven of the indictment did not amount to an abuse of discretion by the trial court.

E.

We conclude that the defendants' remaining claims are meritless. The district court did not err in denying the Batson[6] claim because the Government had a race-neutral explanation for striking an African-American venireperson, and Chief Judge Rambo's finding that the explanation adequately refuted allegations of discriminatory intent has support in the record. Moreover, the defendants failed to make a timely challenge prior to the dismissal of the venire. They made their challenge after the petit jury had been sworn and the rest of the panel dismissed. The defendants' claim that the court abused its discretion by giving a willful blindness instruction must be rejected because a reasonable juror could have inferred from the evidence that

_____

6. Batson v. Kentucky, 476 U.S. 79 (1986).

16

one defendant may not have known precisely what fraudulent act another defendant was committing. The instruction ensured that a juror who believed that a defendant turned a blind eye toward his co-defendant's conduct would not vote to acquit the willfully blind defendant.

III.

The district court committed no error warranting reversal of any defendant's conviction or sentence. Accordingly, the judgment of the district court will be affirmed.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit