**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Michael D. CORBELL, Defendant– Appellant.**

No.  10–30096.

United States Court of Appeals, Fifth Circuit.

March 14, 2011.

Josette Louise Cassiere, Assistant U.S. Attorney, Earl M. Campbell, U.S. Attorney's Office, Western District of Louisiana, Shreveport, LA, for Plaintiff–Appellee.

Ansel Martin Stroud, III, Tutt, Stroud & McKay, L.L.C., Shreveport, LA, for Defendant–Appellant.

Before GARWOOD, ELROD, and SOUTHWICK, Circuit Judges.

PER CURIAM: *

Michael D. Corbell pleaded guilty pursuant to a plea agreement to one count of having made a false statement to a bank. The district court sentenced Corbell to eighteen months of imprisonment and three years of supervised release. The district court also ordered restitution in the amount of $242,846. Corbell objected to the district court's ruling on the loss calculations at sentencing for the purposes of determining the applicable enhancement under the guidelines. Because we hold that the district court erred in its loss and credit calculations, and then erred in determining the resulting applicable guideline range, we VACATE and REMAND for resentencing.

I

In December 2001, Corbell increased the balance of his construction company's line-of-credit loan with First Louisiana Bank (FLB) to $1,115,000. Ron Boudreaux, the president and chief executive officer of FLB, approved the loan. The loan concerned the construction of a new commercial building on land already occupied by two other buildings. To finalize the loan, Corbell executed a commercial pledge agreement, whereby he offered the following as collateral to secure the loan: (1) a first mortgage on the commercial property, (2) a certificate of deposit (CD) redeemed for $77,277.77 (with a pledged value of $72,154), and (3) a promissory note that had been issued to Corbell for $200,000. Corbell represented that he owned the promissory note, but in fact he had sold all of his interest in that note to a third party. In September 2002, Corbell requested that FLB increase the line-of-credit loan by an additional $133,000, or to $1,248,000 total, so that he could complete the construction project. FLB approved this second increase in the line of credit; the new loan was secured by the same collateral that secured the December 2001 loan.

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

By January 2003, interest had become past due on three of Corbell's loan accounts at FLB, including the loan at issue. FLB seized the CD that had served as collateral for the loan at issue and applied its cash proceeds ($77,727.77) toward the interest due on the three accounts, including about $32,000 on the loan at issue, as well as some overdrafts on Corbell's current accounts at FLB. Boudreaux testified that seizure of the CD did not result in any principal reduction on Corbell's $1,248,000 loan.

In October 2003, FLB foreclosed on the loan for nonpayment. Subsequently, Corbell pleaded guilty to one count of having made a false statement to a bank with respect to the promissory note that he no longer owned. After foreclosure, FLB sold the property to one of its commercial customers, Industrial Drive Warehouses, L.L.C. (Industrial), for $1,300,000. In April 2004, the sale from FLB to Industrial was recorded in the parish public conveyance records. FLB provided 100 percent financing for the purchase, with no personal guarantees, and advanced Industrial an additional $100,000 to complete the project. At sentencing, FLB's CEO, Boudreaux, testified that, at the time of the sale to Industrial, no money was paid to FLB. Instead, the property was transferred from FLB's name to Industrial's name, and FLB, according to Boudreaux, "moved it from our books in what we call 'other real estate' to a loan in the name of Industrial."

Following a general audit by the Federal Deposit Insurance Corporation (FDIC), the FDIC required that FLB obtain a new appraisal on the property. The appraisal of the property, done in July 2006, was $1,005,200. Boudreaux testified that because the financing package that had been used for the property exceeded the appraised value, FLB had to "charge off" $310,159, i.e., FLB reduced the financing of the property to 100 percent of its July 2006 appraised value—$1,005,200. The FDIC intervened again when they advised FLB that the Bank would only be allowed to finance the property at 80 percent of its appraised value, not 100 percent. As a result, that same month, FLB lowered the price to $800,000 and provided Industrial with 100 percent financing for the property at the lower price. Boudreaux testified that "[t]he problem with the loan [to Industrial] obviously was there was not near enough cash flow to cover the sale amount[,][s]o [FLB] was forced to write it down to a level [Industrial] could make."

At sentencing, the government contended that the loss, for the purposes of the guidelines, was $448,000, which is the difference between $1,248,000 (the last indebtedness incurred by Corbell) and $800,000 (the final amount that Industrial owed FLB). Corbell disagreed, arguing that the sale of the property to Industrial for $1,300,000 had made FLB whole and that there was no loss. Corbell alternatively contended that the loss amount was $165,878.23. This amount was calculated by deducting from the $1,248,000 loan amount (1) the value assigned to the property, or $1,004,394 (which was 75 percent of the estimated appraisal upon completion of the construction project, as set forth in the original loan application), and (2) the cash redeemed from the CD, or $77,727.77.

The pre-sentence report (PSR), applying the 2001 edition of the Sentencing Guidelines, assigned Corbell a base offense level of six pursuant to U.S.S.G. § 2B1.1(a)(2). The PSR, using the loan amount of $1,115,000, and subtracting $800,000 for the property and $72,154 for the CD (the value of the CD as pledged), determined that "[f]or guideline purposes, the amount of loss is $242,846.00." The PSR recommended a 12–level enhancement pursuant

to § 2B1.1(b)(1)(G), because Corbell was responsible for an intended loss of more than $200,000, but less than $400,000. The PSR also applied a three-level acceptance of responsibility reduction, resulting in a total offense level of 15. The PSR assigned Corbell no criminal history points, which resulted in a criminal history category of I and a guidelines sentencing range of 18 to 24 months of imprisonment.

At the sentencing hearing, the district court made findings of fact that were expressly contrary to the findings in the PSR, but then proceeded to sentence Corbell based on the PSR, rather than on the court's own findings.[1] For example, the district court found that the loss amount of the loan was $1,248,000, but sentenced based on the PSR's incorrect $1,115,000 figure. The district court also found that the sale to Industrial was a paper transaction and would not use it in its calculation, but sentenced Corbell based on the PSR, which did use the sale in its calculation. After indicating his intent to sentence Corbell at the bottom of the applicable guidelines range he determined, the district court imposed a sentence of eighteen months of imprisonment and three years of supervised release. Restitution in the amount of $242,846 also was ordered. Corbell objected to the court's rulings on the loss calculations.

## II

The district court's method of determining the amount of loss is reviewed on appeal *de novo. United States v. Harris,* 597 F.3d 242, 251 (5th Cir.2010). However, the district court's findings of fact are reviewed for clear error. *Id.* at 250. The district court erred both in determining the amount of the loss and the credits against the loss, which resulted in an incorrect guideline range and a sentence that was in error.

Both parties agree that the actual loss here is $1,248,000. They dispute the district court's decision as to what the correct value of the "credits against loss" is in this case. The 2001 version of the guidelines commentary provides courts with the method for determining credits against loss:

> In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

§ 2B1 cmt. 3(E)(ii).

As discussed above, the promissory note was the basis for the false statement, and its value as collateral is therefore not pertinent to calculating the credit against loss. This leaves the other two forms of collateral: the CD, and the value of the commercial property. We now turn to how the district court determined Corbell's sentence with respect to evaluating this pledged collateral.

■ The district court first determined the loss, before any credits. At the hearing, Boudreaux, President of FLB, testified that Corbell's initial loan was $1,115,000, but was later increased to $1,248,000. Also testifying at the hearing was FBI agent Clifford Bland, who had calculated the loss amounts in the PSR using the $1,115,000 figure. He noted that, based on new evidence that the loan

---

1. The district court stated that he was sentencing Corbell based on the PSR "except ... that this sentence is going to be based on a loss of $242,000." The PSR had listed the loss (after taking into account applicable credits) as $242,846. The difference of $846 is not at all relevant to our analysis.

was actually $1,248,000, the PSR was incorrect. Based on this testimony, the district court emphasized that "$1,248,000 [not $1,115,000] is what we're dealing with, because that's the amount of money [Corbell] borrowed from [FLB] on the second loan," but sentenced Corbell based on the number in the PSR, which used the $1,115,000 figure. In light of the evidence at the hearing and the parties' acknowledgment that the correct amount is $1,248,000, the district's decision to use the $1,115,000 number was clearly erroneous.

The district court then determined the credits against loss, examining the two forms of collateral pledged: the CD, and the first mortgage on the commercial property. At sentencing, the district court stated that he had to consider "the fact that the CD went entirely to unpaid interest and other charges, and not to principal, which ... hadn't been disputed." This statement suggests that the district court would not use the CD as a credit. However, the district court sentenced Corbell according to the PSR, which did use the CD as a credit. The district court's statements at sentencing and its decision to sentence based on the PSR are inconsistent. Therefore, we now turn to the evidence to determine whether the CD should have been used as a credit against the loss—a determination that impacts Corbell's guideline range and applicable sentence.

█ FLB did not credit the total value of the CD ($77,277.77) towards the $1,248,000 loan at issue here. At sentencing, Boudreaux testified that around $32,000 of the $77,277.77 [2] in the CD was applied towards interest on the $1,248,000 loan. The remaining proceeds of the CD

appear to have been used against other debts that Corbell had with the bank. In addition, the government submitted evidence at sentencing confirming that $32,616.59 was used towards interest on the loan at issue. If we subtract $32,-616.59—the only money in the CD actually used against the loan at issue—from $77,277.77, we are left with $44,661.18 in the CD that could possibly have been used as a credit. Based on this evidence, Corbell is entitled to a partial credit of $44,661.18, which is the amount remaining in the CD after taking into account FLB's payment on interest due on the loan at issue. Therefore, the district court erred in its treatment of the CD.

In its initial and supplemental briefing, the government contends that the district court could not have applied any of the CD as a credit because that money was used against other debts that Corbell had with FLB. The government points to language in the promissory note allowing FLB to "apply any funds that Borrower may have on deposit with Lender or in certificates of deposit or other deposit accounts as to which Borrower is an account holder against the unpaid balance of this Note and any and all other present and future indebtedness and obligations that Borrower may then owe to Lender...."

The government's argument misses the point. Regardless of whether FLB had the right to use the CD proceeds against any other debts that Corbell had with FLB, actual loss under the guidelines is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1 cmt. 2(A). The offense here is making a false statement to FLB in order to procure the $1,248,000 loan,

2. We use the $77,277.77 figure (value of the CD redeemed) and not the $72,154 figure (value as pledged) because the guidelines plainly state that the value is "the amount the victim has recovered at the time of sentencing from disposition of the collateral," not the value of the collateral as pledged.

making it the only loan at issue in this appeal. While FLB may have suffered other losses as a result of its business relationship with Corbell, those losses are not relevant in this case. FLB's choice to use the proceeds from the CD toward other accounts, even if it had the right to do so, cannot, under the evidence here, be used to deny Corbell credit towards the loss, where, as here, Corbell had specifically pledged the CD to secure the loan at issue.

As to the commercial property, the district court noted, at sentencing, that the sale to Industrial was a paper transaction and should not be used, but then proceeded to base the sentence on the PSR, which used the sale. At the hearing, the district court stated that the sale was "a paper transaction by the bank to get the loan off of their books into a different form for FDIC audit purposes" and "is not any part of the calculation that the Court is required to make." In addition, the district court noted that the reductions in price associated with the sale were also not relevant—"I'm listening very carefully but I don't know where the 80 percent came from. The 80 percent didn't apply to the Industrial people who came along and took over one million three. They financed the whole thing; one million three; no 80 percent was involved.... The 80 percent, quote, policy of the bank that Mr. Bland talked about is not proved in this case in this record up to this point." The district court continued, "It's not testimony from the FDIC or from the president of the bank or somebody who knows what the bank policy is. That's why it has no value at the moment."

Based on these findings, it appears that the district court, for guidelines purposes, did not believe that the commercial property had been disposed of properly at the time of sentencing. Under the guide-

lines commentary, if collateral has not been disposed of at the time of sentencing, the collateral's fair market value is used to calculate credit against loss. *See* § 2B1 cmt. 2(E)(ii). The fair market value of the property here is $1,005,200. However, the district court did not sentence Corbell based on the fair market value of the property. Instead, contrary to its own factual findings, the district court sentenced Corbell based on the PSR, which used the $800,000 number. This was clear error.

In sum, as the government acknowledges, the district court did not explain its rationale in determining the credits and calculating the loss amount, which simultaneously are at odds with the PSR and purport to follow the PSR.

### III

Once a finding of error has been made, it is the government's burden to show that the error was harmless. *See United States v. Andrews,* 390 F.3d 840, 846 & n. 9 (5th Cir.2004). To do so, the government must show that, absent the error, the sentence would have been the same. *See id.* at 846. We have held that "the crux of the harmless-error inquiry is whether the district court would have imposed the same sentence, not whether the district court could have imposed the same sentence." *United States v. Delgado–Martinez,* 564 F.3d 750, 753 (5th Cir.2009) (citing *United States v. Huskey,* 137 F.3d 283, 289–90 (5th Cir.1998)). In order to render a sentencing error harmless when the sentence imposed falls within both the erroneously calculated range and the correct range, "[t]he proponent of the sentence 'must point to evidence in the record that will convince us that the district court had a particular sentence in mind and would have imposed it, notwithstanding the error made in arriving at the defen-

dant's guideline range.'" *Id.* (quoting *Huskey,* 137 F.3d at 289); *see also U.S. v. Ibarra–Luna,* 628 F.3d 712, 717 (5th Cir. 2010) ("an incorrect guidelines calculation will usually invalidate the sentence").

■ Here, a calculation based on the evidence at sentencing renders a lower guidelines range, and the government has not pointed to any evidence in the record showing that the district court would have imposed the same sentence, notwithstanding the guideline range error. The calculation proceeds as follows: the undisputed loss is $1,248,000. We then subtract the "amount the victim has recovered at the time of sentencing from the disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the time at sentencing." As discussed above, the commercial property was originally sold to Industrial for $1.3 million, but actions by the FDIC subsequently required FLB to reduce the price to the fair market value of the property, which was $1,005,200, and then again to $800,000. However, the district court's finding at sentencing was that the deal was a paper transaction and would not be part of the calculation. Therefore, under the guidelines, where there is no disposition of collateral at the time of sentencing, courts are required to use the fair market value of the property, which is $1,005,200.

Using the appraisal value of $1,005,200 for the property and the $44,661.16 left in the CD to calculate the credits against loss, the loss amount would be $198,183.82. Under the guidelines, this would result in a 10–level enhancement, for a total offense level of 13, which would result in a guideline range of 12–18 months. Corbell has been currently sentenced to eighteen months, the low end of the incorrect guideline range of 18–24 months used by the

district court. Because the district court's error is not harmless, we VACATE and REMAND for resentencing.[3]

---

**3.** We note that Corbell's projected release date is July 5, 2011.